IN THE MATTER OF JOSEPH E. SADOFSKI, JUDGE OF THE
SUPERIOR COURT OF NEW JERSEY.

Argued January 8, 1985—Decided February 8, 1985.

*Patrick J. Monahan, Jr.,* argued the cause for complainant Advisory Committee on Judicial Conduct.

*Morris Brown* argued the cause for respondent (*Wilentz, Goldman & Spitzer,* attorneys; *Morris Brown* and *Frederick J. Dennehy,* on the brief).

PER CURIAM.

This proceeding against respondent, Joseph E. Sadofski, a judge of the Superior Court, arises out of two complaints filed with the Advisory Committee on Judicial Conduct (ACJC), identified as the Schuster and W.G. matters. The Committee found that respondent had breached his duty to preserve and protect the dignity of courtroom proceedings contrary to the mandates of Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2A (a judge should avoid impropriety and the appearance of impropriety in all his activities), and 3A(2) and (3) (a judge should perform the duties of his office impartially and diligently). Common to both complaints was the use of intemperate and offensive language during courtroom proceedings.

As found by the ACJC, the relevant facts are:

A. *Schuster Complaint*

Complainant was a litigant in a bitterly contested matrimonial action involving issues of visitation and domestic violence. His former wife (Harary) has custody of their two children. Complainant sought increased visitation privileges. In connection with his attempt to gain greater visitation, Complainant filed an application for a restraining order against Harary. Harary also sought an order of protection for herself and her children against Complainant.

Respondent had held preliminary hearings on both applications. On July 18, 1983, a final hearing on the restraining order sought by Harary was held. At that hearing, Respondent began by briefly reciting the history of the litigation. He then called on Harary's counsel (Penhorne) to make his presentation. Penhorne sought to advise the court that his client had been "dragged into" numerous court appearances in New York and New Jersey. Respondent immediately interrupted Penhorne:

Don't start the dragging in, okay? Just give me legally what you want, all right? ... This isn't the matrimonial court so I'm not going to listen to all the dragging in situations.

Penhorne then proceeded to request the relief sought, specifically, an order of protection to prevent Complainant from abusing Harary and harassing her children. He made reference to previous litigation in New York where a court had issued a similar order. When Penhorne tried to explain to the court the similarity in the present proceeding, Respondent again interrupted:

COURT:     I don't care what the New York court said, to start with, okay?

PENHORNE: Well, can't I tell you what the facts are, your Honor?

COURT:     Well tell me the facts of the case, but I don't want to know what the New York court said.

Later in the proceeding, Respondent further displayed his dissatisfaction with the procedural actions of the New York Court. When advised of the New York decree concerning visitation Respondent stated:

COURT:     That sounds like a real horsing around, it sounds like a real jerking around.

PENHORNE: Well, your honor, I'm not responsible for what the New York judge does.

COURT:     Well, you're telling me what the judge in New York does, and I don't give a damn, because I'm not going to horse these people around.

The issue of visitation also angered Respondent. At one point in the proceeding, the terms of Complainant's visitation privileges were under discussion. Respondent stated to Harary:

I'll continue the visitation until then, but you better figure out how the hell visitation is going to occur, because your attitude of they don't want to see him, that's for baloney. That's for baloney. We don't take votes from nine year old and eleven year old kids.

Respondent was displeased as well with the fact that Harary had not brought her boyfriend to testify as a witness to some of the alleged conduct of Complainant. When Penhorne stated that the boyfriend would be available on call, Respondent retorted:

We're not going to make a three day operation out of this, this stuff. This is stuff.

Respondent, however, directed his harshest comments to Complainant, who was unrepresented at this hearing. For example, Respondent interrupted the direct examination of Harary to question Complainant about whether he had been arrested near Harary's home on a certain date for violation of a protective order issued in New York. After Complainant had answered Respondent told him:

Mr. Schuster, you are close right now to going to Middlesex County Workhouse. I would suggest you sit down and be quiet for a minute. Get it together, Mr. Schuster, because you're going to go out that door in two minutes and you'll be there until I call you back and I'm going on vacation pretty soon and I'm not going to call you back until after I come back.

Shortly thereafter, in reference to Complainant, Respondent commented to Penhorne:

Well, I want proof as to the arrest because upon the arrest I'm going to charge him with criminal contempt and send him up to the workhouse.

The July 18 hearing was continued on July 21, 1983. Complainant was now represented by counsel (Noto). Respondent was impatient with Noto, who was new to the case. When questioned by Noto as to whether the court desired that Complainant testify as to all complaints at one time or whether testimony as to each complaint be taken separately, Respondent replied:

> We're not going to put him on again, put them all on the stand at one time ... And its going to be short and sweet.

When Noto's examination of Complainant was not proceeding quickly enough for Respondent, he remarked to counsel:

> Let's get it moving. I don't want to hear all this stuff, Mr. Noto.

He also commented to Penhorne about his cross examination of Complainant's witness. At the conclusion of her testimony, he said:

> Everybody is getting a lot of jollies out of this thing. I don't know what the hell everybody's jollies are stirred up about this, Mr. Schuster. I don't know what your jollies are, grinning like an idiot.

The result of the July 21, 1983 hearing was to grant the protective order to Harary forbidding Complainant from having any contact with her or her family. In addition, Respondent terminated Complainant's visitation rights and ordered that he undergo psychiatric evaluation and counseling. Finally, Complainant was warned that if he violated Respondent's order, he would be arrested and sent to the Middlesex County Adult Correction Center.

### B. *W.G. Complaint*

Complainant in this matter is the mother of a juvenile defendant, W.G. W.G. was charged in a Juvenile and Domestic Relations Court proceeding with using unreasonably loud and offensive language, and for certain motor vehicle violations.[1]

On January 6, 1983 Respondent presided in the case of *State v. W.G.* After being advised of his rights, W.G. pled guilty to the motor vehicle violations, which plea the Court accepted.

With regard to the other complaint, W.G. pled not guilty. This case involved W.G.'s use of loud, abusive, and offensive language in the presence of, and directed towards D.C. In addition, it was alleged that W.G. threatened to assault D.C. and destroy her home.

---

[1] Prior to the Committee's consideration of this matter, Respondent's attorney requested access to the juvenile file in order to determine whether there were any documents which would be of assistance to Respondent. Pursuant to N.J.S.A. 2A:4A–60 these records were sealed. The Committee considered whether access could be provided, and determined that the appropriate method would be by way of an *in camera* application by Respondent's counsel to the presiding judge of the family court in Middlesex County. The Committee joined in the application, and an Order was signed by the presiding judge. At the Committee hearing, however, no documents from the juvenile file were entered into evidence.

D.C. was called to testify. She briefly described the circumstances which gave rise to her complaint. She then asked Respondent whether he desired her to repeat the defendant's comments that had been made to her. Respondent replied:

You'd better, if I'm supposed to find him guilty.

After finding W.G. guilty on the offensive language charge, Respondent directed the following comments to him:

I think that you're ripe for a prison term. Seventeen years old, and you're behaving like a raving eleven year old asshole. That's what you're behaving like son.

Respondent then asked W.G. how he spent his time. W.G. responded that he worked part-time for his father. He also told Respondent that he had quit school during tenth grade. Respondent replied:

And you ain't got anything better to do; play in forts and go on people's property and do some stupid things like that. That's where you're at, at this stage in your life? That's crap son, it really is. It's nothing but garbage. What the hell is coming down with you W.?

Respondent was not only harsh with the defendant but also with his mother, Complainant in this disciplinary matter. After sentencing the defendant to pay $75.00 for some of the property damage he caused, Complainant objected. Respondent told her:

I'll give you an alternative lady, you want to pay $75.00 or do you want to spend six months in jail?

The basis of Complainant's objection was that the order for payment of the $75.00 damages was improper. Complainant attempted to explain that a police commissioner had told her that the complaining witnesses did not really know who had caused the damage. Respondent answered:

I don't give a damn what any Police Chief says ... You're (sic) kid is a punk, a no-good rotten punk, and I'll either throw him in the can, or he'll pay the restitution. Yeah.

When Complainant voiced her concerns further, Respondent concluded the proceeding by saying to her:

You gotta be kidding me lady, you got enough guts to stand up and say that to me.

A partial explanation of Complainant's difficulty with Respondent's decision regarding restitution was the fact that the money was to be paid for damages to the property of a neighbor of the person filing the juvenile complaint against W.G. This neighbor, D.G., was a witness in the State's case on the offensive language charge. Her testimony, in part, described certain damage done to her property shortly before the incident in question took place. Respondent cautioned this witness to confine her testimony solely to the allegations before the court. When W.G. sought to cross examine D.G., Respondent told her not to answer an improper question.

I'm not investigating any part of the damage complaint. Anything else?

Nevertheless, at the conclusion of the hearing, Respondent ordered the Defendant to pay D.G. $75.00 as restitution. This restitution was ordered

despite the fact that the Defendant had not been charged with causing damage to D.G. property, no testimony had been elicited to prove that the Defendant had actually caused the damage, and Respondent had instructed the parties that the issue of damages would not be considered by the court.

Based on those findings, the ACJC reached the following decision and recommendation:

The Committee finds that by clear and convincing evidence Respondent has engaged in unethical conduct in failing to uphold his duty to protect and preserve the dignity of courtroom proceedings. He has engaged in a stream of impertinent, uncouth, and vulgar language which demeaned the judicial process and unnecessarily degraded, belittled, and humiliated both the parties to the proceedings and, in the W.G. matter an interested observer, the Defendant's mother.

The evidence against Respondent consisted principally of transcripts of the proceedings in question. Respondent acknowledged that he made the various remarks attributed to him but sought to justify his conduct by way of an explanation of the underlying circumstances in each proceeding.

With regard to the Schuster complaint, Respondent noted that because of the vacation schedules of the other judges sitting in the Juvenile and Domestic Relations Court and in the Matrimonial Division, he was the only judge to hear juvenile, domestic relations, domestic violence, and matrimonial actions. He estimated that his work load at this time involved hearing approximately 200 to 300 cases per week.

At the July 18 hearing, Respondent believed that the only issue he could consider in a domestic violence action is whether the life, health, and well-being of the complaining party is endangered. He felt that it would be inappropriate to consider questions of visitation and support prior to the determinations of these other things. Accordingly, when he interrupted Harary's counsel during his recitation of the history of the New York matrimonial action, it was only because of his belief that the domestic violence issue should be given precedence. Respondent was further concerned that because of the tight scheduling of cases the discussion of peripheral issues would involve the Court in a lengthy hearing.

With regard to the threat to have Schuster arrested, Respondent stated that he never intended to carry out the threat. Rather, the threat was made in response to Schuster's courtroom behavior. At that point in the proceeding, Respondent was aware that Schuster was in violation of a court order restraining him from having any contact with his children or his ex-wife without prior communication to them. Respondent stated that when Schuster was apprised of the situation he became uncontrollable making it obvious that threats of incarceration were the only method of controlling his behavior. However, Respondent also believed that Schuster had serious psychiatric problems which would make actual incarceration inappropriate. It was the threat of incarceration rather than imprisonment itself which Respondent hoped would accomplish his purpose.

Finally, with regard to Respondent's remark that Schuster was "grinning like an idiot" Respondent explained that during the hearing Schuster was laughing and joking, facts not noted in the court record. Harary was becoming more and more upset by Schuster's actions. After his behavior had continued for several minutes, Respondent made his comments.

At the hearing before the Committee, Respondent conceded that the way in which he handled the Schuster case was inappropriate. He noted the stress that he was under during this period of time, and requested that the Committee try to understand the unique circumstances of this case.

In connection with the W.G. matter, Respondent again explained his conduct in reference to his familiarity with the history of this particular defendant. Not only had W.G. been before the court on a number of prior occasions, but Respondent had twice placed him on probation and ordered him to attend counseling and school. The situation was complicated by what Respondent perceived as a poor attitude by the defendant's parents, which made any possibility of reform problematic.

In the hearing before this Committee, Respondent again conceded that the language he used in the W.G. proceeding was inappropriate. Nevertheless, Respondent acknowledged that he deliberately used abusive and offensive language in an effort to communicate with the juvenile defendant on a level that the defendant would understand.

As to the Complainant's concern that Respondent had threatened to throw her into jail if the fine imposed on the Defendant were not paid, Respondent felt that the transcript was in error on this point. Respondent noted that he would have no jurisdiction over Complainant, and hence, would have no authority to have her incarcerated. The Committee pointed out, however, that the letter of complaint alleging that Respondent had made the threat was sent prior to preparation of the transcript.

The Committee is troubled by Respondent's conduct in these two matters. While the Committee appreciates the stress under which Respondent was operating, it nevertheless discerns a pattern in his use of inappropriate language in the courtroom. This finding is supported not only by the evidence adduced before the Committee in the present proceeding, but also by the fact that Respondent had been previously admonished by the Committee for using inappropriate language. (See *In the Matter of Judge Joseph E. Sadofski*, ACJC 83–30). Although Respondent received the letter of admonishment after occurrence of the conduct complained of in these proceedings, the Committee is concerned that had Respondent never been notified of his inappropriate use of language, such conduct would still be continuing.

What is even more troubling to the Committee is Respondent's use of offensive and abusive language in a proceeding in which the juvenile defendant is charged with precisely the same conduct. The Committee cannot accept the Judge's explanation that by his own use of this language he was trying to reach an otherwise unreachable defendant. If anything, Respondent communicated the message to the Defendant that it is permissible for the Court to say things that if said by the Defendant would be punishable.

For the foregoing reasons, the Committee finds that Respondent violated Canons 1, 2A, 3A(2), and 3A(3) of the Code of Judicial Conduct. Accordingly, the Committee respectfully presents this matter to the Supreme Court with the Recommendation that Respondent be publicly reprimanded for his conduct in both of these matters.

One member of the ACJC voted to dismiss the complaint in the belief that a letter of guidance to respondent would be sufficient.

Before us, respondent frankly acknowledges the inappropriateness of the language he used in both matters. He points out that both offenses occurred early in his judicial career and that there has not been any repetition of the use of inappropriate language by him in the interim since the filing of the Schuster complaint. At the time of the court proceeding that gave rise to the Schuster complaint, July 1983, respondent was the only Juvenile and Domestic Relations Court judge in Middlesex County hearing cases. He estimates that his caseload during that time was two hundred to three hundred cases per week; doubtless, he was under considerable stress. With respect to the W.G. matter, respondent states that his inappropriate language was not due to a loss of temper, but to an attempt to communicate effectively with the juvenile and his mother.

As did the ACJC, we appreciate the stress to which respondent was subjected. We conclude, however, that the language used is unacceptable for a judge conducting a judicial proceeding. It may be, as respondent contends, that Mr. Schuster was an exasperating litigant. It may also be, as respondent explains, that W.G. was "on the razor's edge, and he could fall off on the good side, or he could fall off on the bad side." No matter how tired or vexed, however, judges should not allow their language to sink below a minimally-acceptable level. Judges, like other members of society, will occasionally have a "bad day." Even on such days, however, a judge must conduct court proceedings in a manner that will maintain public confidence in the integrity and impartiality of the judiciary. We

conclude, as respondent now acknowledges, that he should not have used the offensive language employed in either case.

■ After a careful review of the entire record, we adopt the findings of the ACJC and conclude that respondent should be publicly reprimanded.

■ Respondent has moved to supplement the record by introducing information tending to establish that he has otherwise performed his judicial duties in an acceptable manner. That information merely confirms our understanding of the record and is, therefore, cumulative. Consequently, respondent's motion to supplement the record is denied.

So Ordered.

*For reprimand*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

*Opposed*—None.